# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF MASSACHUSETTS

## EASTERN DIVISION

| | |
|---|---|
| **In re**<br><br>**YEFIM MOVSHOVICH,**<br><br>           **Debtor**<br>———————————————<br>**MARK ABRAMOV,**<br><br>      **Plaintiff**<br><br>**v.**<br><br>**YEFIM MOVSHOVICH,**<br><br>      **Defendant** | **Chapter 7**<br>**Case No. 12-13772-FJB**<br><br><br><br>**Adversary Proceeding**<br>**No. 12-01193** |

## <u>MEMORANDUM OF DECISION</u>

I.     **Overview**

By his complaint in the adversary proceeding, plaintiff Mark Abramov ("Abramov") seeks a

determination that a debt owed to him by the defendant and chapter 7 debtor, Yefim Movshovich

("Movshovich"), is excepted from discharge under 11 U.S.C. § 523(a)(2)(A), (a)(2)(B), and (a)(4).  After a

trial, the Court now makes the following findings and rulings and on the basis thereof, concludes that

the judgment debt is excepted from discharge in its entirety, including all accrued and accruing interest

thereon.

II.     **Procedural History**

The debt for which Abramov seeks a determination of non-dischargeability arises out of a failed

business relationship between the parties that lasted roughly five years, from early-2002 through early-

2007.  Following the dissolution of the business relationship, Abramov commenced civil litigation against

Movshovich for breach of contract in Suffolk Superior Court.  On March 8, 2012, by way of a jury verdict, Abramov was awarded a judgment against Movshovich in the amount of $225,000 plus interest. Abramov subsequently obtained two executions against Movshovich, in the amounts of $18,073.40 and $339,720.58 on March 8, 2012 and March 12, 2012, respectively.

On May 1, 2012, Movshovich filed a petition for relief under Chapter 7 of the Bankruptcy Code, commencing the present bankruptcy case.  On July 27, 2012, Abramov timely filed the complaint commencing this adversary proceeding.  Abramov seeks a determination that Movshovich's state-court judgment debt to him is excepted from discharge under § 523(a)(2)(A) as a debt arising from false pretenses, a false representation, or actual fraud, under § 523(a)(2)(B) as a debt obtained by use of a statement in writing that is materially false, and under § 523(a)(4) as a debt arising from fraud or defalcations while acting in a fiduciary capacity.  The parties tried the matter over three days and, after trial, submitted proposed findings and rulings and post-trial briefs.

III.   **Findings of Fact**

A.   **Initial Negotiations**

Europe Today, Inc. ("Company") is a privately held for-profit Massachusetts corporation located in Brighton, Massachusetts and engaged in the business of selling furniture. During all times relevant to this adversary proceeding, Movshovich and his wife Irina Movshovich ("Irina") were officers of the Company.  This case concerns negotiations by Abramov and his wife, Sofia Marder ("Sofia"), to purchase a one-half interest in the Company from Movshovich and Irina.  Sofia, who had been friends with Movshovich and Irina, introduced her husband to the couple in late 2001, at which time, the parties began discussions concerning the sale of an interest in the Company.  When negotiations began, Movshovich was a thirty-four percent stockholder in the Company and Irina was a thirty-three percent stockholder in the Company.  The final thirty-three percent of Company stock was owned by the Movshovichs' business partner, Jakov Segal ("Segal").

In an initial September 2001 meeting between Abramov and Movshovich, Movshovich expressed that he wanted "to get rid of his business partner," Segal.  Movshovich stated that he and Irina would sell a one-half interest to Abramov if they were able to buy out Segal's interest.  During this meeting, Movshovich represented the value of the Company to be over $1 million and stated that the store had an annual net profit of $220,000.

The parties met again in January 2002.  At this meeting, Movshovich and Abramov again discussed the issue of the Company's value.  As Abramov explained in his testimony, he disagreed with Movshovich's estimate.  "I told [Movshovich] that the store -- the value of the store was overrated and I suggested instead of 1.5 million dollars, $500,000."  Abramov offered to purchase a one-half interest in the Company for $250,000, as he estimated the value of the Company to be $500,000.  Abramov also stated that prior to the final sale, he wanted to examine the "official financial documents of the store," including bank statements and tax returns in order to fully assess the value of the Company.   In a subsequent telephone conversation, Abramov again asked Movshovich for these documents.  Movshovich "apologized and said that they were not available" as the accountant for the Company had been too busy to prepare them.

The parties continued to have more detailed discussions regarding the possible sale, and in February 2002, Abramov, Sofia, Movshovich, and Irina held a meeting at the Company store.  At this meeting, Movshovich and Irina presented to Abramov and Sofia "boxes of sales slips" and a "working journal where all the financial information of the company [was] recorded."  From these documents, Movshovich and Irina guided Sofia in creating handwritten summaries of the store's financial operations for the years 2000 and 2001, while Abramov observed.  Based on the sales slips and corporate journal provided by Movshovich and Irina, the group created a summary sheet reflecting the Company's gross sales, expenses, and net profit for the year 2000 ("2000 Financial Summary") and a second summary

sheet reflecting the Company's gross sales, expenses, and net profit for the year 2001 ("2001 Financial Summary").

Movshovich and Irina presented the 2000 Financial Summary and the 2001 Financial Summary to Abramov and Sofia as evidence of the value of the Company.  As Abramov later testified, the purpose of preparing the summary sheets was to demonstrate "how successful the company was because we haven't been given any official documents.  So the purpose was to show the success of the company." Abramov considered the summary sheets to be accurate representations of the Company's finances as they were based on what Movshovich alleged was "the working journal of the company where all the financial data of the company was recorded and, in turn, the journal was based on sales slips."

The 2000 Financial Summary showed gross sales of $1,117,380 and net profit of $218,250 for the year 2000.  The 2001 Financial Summary showed gross sales of $1,177,600 and net profit of $226,420 for the year 2001.  The information provided to Abramov and Sofia in the form of the 2001 Financial Summary is not consistent with the information the Company provided to the Internal Revenue Service for the year 2001.  The Company's federal income tax return for the year 2001 ("2001 Company Tax Return"), a document that Abramov was only able to obtain years later by way of discovery in state court litigation, reported gross sales of $516,862 and a net operating loss.

The parties continued to meet and discuss the operations of the Company in March and April of 2002.  During these meetings, Abramov repeated his request to review the "official financial documents" of the Company beyond the sales slips, the corporate journal, and the summary sheets. Movshovich responded to these requests by stating that the accountant was not available to provide the information.

**B.  The Deal**

In May 2002, the parties formulated a plan as to how Abramov might purchase a one-half interest in the Company.  As part of the deal, Abramov would pay Movshovich a deposit of $150,000.

4

Movshovich would use this $150,000 plus $10,000 of his own money to buy out the thirty-three percent interest of Segal who had offered to sell his interest for $160,000.  Upon payment of the deposit, Abramov would begin working in the store to become familiar with the operations of the Company and to see how the relationship between Abramov and Movshovich developed as potential partners. Movshovich promised to make all Company financial documents available to Abramov in 2003 after the Company accountant completed all year-end accounting for 2002.  The parties agreed that by April 2003, after Abramov had worked at the Company for several months and had examined the company's financial documents, either party could decide not to proceed with the deal.  If either party decided that they did not want to move forward with the deal, then Movshovich would pay back Abramov his entire deposit of $150,000, plus an additional $1,500 for each month he had worked as an employee of the Company.  Alternatively, if both parties agreed to move forward with the plan, then Abramov would receive fifty percent of the net profit earned by the company during June through December 2002. Additionally, Abramov would owe a remaining balance of $100,000 in addition to the initial $150,000 deposit for a total purchase price of $250,000 in exchange for a fifty percent interest in the Company. Upon payment of the additional $100,000, the parties would enter into a formal written agreement in which fifty percent of the stock would be transferred to Abramov.

### C.   June 5, 2002: Abramov pays $150,000 Deposit; Movshovich buys out Segal

On June 5, 2002, Abramov, Sofia, Movshovich, Irina, and Segal were all present for a meeting in which Abramov paid Movshovich $150,000, representing the agreed upon deposit price.  At this meeting, Segal was given the $150,000 from Abramov and an additional $10,000 in exchange for his thirty-three percent share of the Company stock, which share was transferred to Movshovich.

Movshovich asserts that he viewed Abramov and Sofia as owners of a fifty percent interest in the Company after their payment of $150,000 at this meeting on June 5, 2002.  However, Movshovich concedes that no steps were ever taken to formally transfer any Company stock to Abramov or Sophia.

In light of this fact and in light of Movshovich's subsequent behavior, I do not find Movshovich's assertion that he viewed Abramov and Sofia as co-owners of the Company to be credible.  Rather, I credit Abramov's account of the parameters of the deal, set forth above, in which an ownership interest would not be transferred to Abramov until he had an opportunity to review additional financial documents and until he paid Movshovich an additional $100,000.

As of the June 5, 2002 meeting, the only financial documents Abramov had received from Movshovich were the company sales slips, the corporate journal, and the summary sheets created during the February 2002 meeting.  When asked why he paid Movshovich $150,000 prior to reviewing the other "official financial documents of the company," Abramov testified as follows: "Looking through the journal of Europe Today, I realized that the gross sales of the company were over one million dollars. And besides, that was part of our agreement that in early 2003 if I disagree with something I could walk away and get back all my money."  Abramov further testified that he relied upon the information contained in the 2000 Financial Summary and the 2001 Financial Summary as evidence of the Company's value.

**D. Abramov begins working at the Store; Irina and Movshovich ask Abramov to borrow money**

On June 6, 2002, Abramov began working at the Company store.  During this time, Abramov worked with the company journal, sales slips, invoices, and price lists.

On four separate occasions between June 2002 and February 2003, Irina approached Abramov to borrow money.  During this period, Abramov wrote the following four checks totaling $25,000 and gave them to Irina:

$8,000.00 check on June 15, 2002 made out to Europe Today;
$5,500.00 check on August 18, 2002 made out to Europe Today;
$6,500.00 check on August 19, 2002 made out to Quicken Import[1];
$5,000.00 check on February 21, 2003 made out to Yefim Movshovich.

---

[1] Quicken Import was another Company owned by Irina and Movshovich at the time.

With respect to these disbursements, Abramov, Irina, and Movshovich agreed, at some point after Abramov wrote the first check, that if Abramov ultimately completed the purchase of a fifty percent interest in the Company, this $25,000 would be credited toward the outstanding $100,000 balance. Alternatively, the parties agreed that if the sale did not occur, Abramov would be refunded the full $25,000 in addition to the initial $150,000 deposit.

Movshovich sets forth a starkly different explanation as to why Abramov wrote these four checks between June 2002 and February 2003. Movshovich claims that, prior to the June 5, 2002 closing, *he* loaned $25,000 *to Abramov and Sofia* as part of Abramov's deposit that was used to buyout Segal. Movshovich claims that Abramov and Sofia were having trouble coming up with the full $150,000. Movshovich asserts that in order to move forward with the buyout of Segal, he loaned Abramov and Sofia $25,000 of the $150,000 they brought to the meeting on June 5, 2002. He further asserts that the four checks Abramov later wrote, totaling $25,000.00, were a repayment of *his loan to Abramov*. I do not find Movshovich's account to be credible. Instead, I credit Abramov's account as set forth above.

### E.   Discrepancies between the 2002 Financial Summary, the 2002 Company Tax Return, and The Company Bank Account

In February 2003, after Abramov had been working at the Company store for several months, Movshovich presented to Abramov a new handwritten financial summary sheet ("2002 Financial Summary") which indicated the Company's gross sales and net profit for the year 2002. The 2002 Financial Summary showed gross sales of $1,101,548 and a net profit of $223,756 for the year 2002. Based on Movshovich's representations and Abramov's own access to the corporate journal and customer sales slips, Abramov believed the information presented in the 2002 Financial Summary to be an accurate representation of the Company's finances for the year 2002. However, at this time, Abramov had still not been granted access to the Company tax filings and bank statements. Nor had

Abramov been granted access to any other Company documents beyond the sales slips, corporate journal, price lists, and handwritten summary sheets.

The information presented in the 2002 Financial Summary is not consistent with the information the Company provided to the Internal Revenue Service for the year 2002.   The Company's federal income tax return for the year 2002 ("2002 Company Tax Return"), another document that Abramov only obtained years later in the course of litigation discovery, reported gross sales of only $469,853 and a net operating loss.  The Company's tax returns were completed by the accountant for the Company, Ted Ronkin ("Ronkin").  Ronkin was provided access to the bank statements for the Company's account with Bank of America and with the Company's inventory record.  However, Ronkin was not given the company sales slips or corporate journal from which the 2002 Financial Summary was allegedly created. A comparison of the 2002 Financial Summary with the bank statements for the Company account for the period of April 2002 through December 2002 reveals that a significant portion of the proceeds from the alleged gross sales were never deposited into the company account.

| Month | Gross Sales as indicated by the 2002 Financial Summary | Total Deposits into the Company Bank Account |
|---|---|---|
| April 2002 | $102,320.00 | $57,707.09 |
| May 2002 | $137,063.00 | $42,214.58 |
| June 2002 | $84,560.00 | $47,227.98 |
| July 2002 | $76,250.00 | $44,319.90 |
| August 2002 | $85,690.00 | $58,723.37 |
| September 2002 | $75,930.00 | $36,713.32 |
| October 2002 | $77,730.00 | $44,013.02 |
| November 2002 | $76,665.00 | $42,892.33 |
| December 2002 | $66,010.00 | $35,470.78 |
| **Total April – December** | **$782,218.00** | **$409,282.37** |

As explained by Movshovich at trial, a significant portion of Company customers would pay for their purchases in cash.  When customers paid in cash, Movshovich put the cash in his pockets and brought it home.  When asked whether he took home the cash he received from customers, Movshovich testified, "In the store when I got cash, yes [. . .] I kept it at home because it wasn't safe to keep cash at

8

the store." Movshovich mixed these cash profits from the Company store with his personal cash and used a portion of Company cash profits for personal expenses.

At trial, Movshovich explained that part of his reason for taking cash profits home was because he and Irina made frequent trips to New York and New Jersey to purchase furniture for the store. He could get better deals if he paid for these purchases in cash. Accordingly, he stored the cash he received from customers in various places in his home until he and Irina made a trip to New York or New Jersey. This practice of storing cash in his home and then bringing it to purchase furniture in New York and New Jersey predated Abramov's involvement with the Company and continued after Abramov began working at the store.   When asked to approximate how much he had "taken from customers in cash for the purposes of buying furniture down in New York and New Jersey in the year 2000 and 2001," Movshovich testified as follows:

> I cannot give you the figure. It was like -- yes, it was the most successful years in the business, but what was -- I would say, I went twice to New York and 10, 20, 20, 25,000 per month, so -- well, maybe yes, the successful years, 200 [thousand dollars] per year maybe.

The cash Movshovich took home was not reflected in the Company bank statements, which were used by the Company accountant, Ronkin, in composing the Company's tax returns. Additionally, Movshovich did not disclose his practice of storing cash in his home for eventual furniture purchases to either Abramov or Sofia during the negotiations in early 2002.

Q. When you were discussing valuation of Europe Today, the business, with [Abramov] and Sofia in early 2002 did you tell them that you were taking out somewhere around $200,000 a year in cash for the purposes of buying furniture down in New York and New Jersey?

A. I don't remember them asking me those questions.

[. . .]

Q. During the negotiations with [Abramov] and Sofia in early 2002 did you tell them that you were taking cash from the company and you were putting it down in the walls in your basement?

A.        No, I didn't, sir. They never asked me this question.

**F. Use of the Company Bank Account for Personal Expenses**

Prior to the meeting on June 5, 2002 and continuing after Abramov began working at the

Company, Movshovich and Irina used the Company bank account for personal expenses, including

gambling and making home mortgage payments.  At trial, Movshovich admitted writing checks from the

Company bank account for mortgage payments on his house.  A review of the Company bank

statements for the period of April through December 2002 reveals frequent withdrawals from ATMs at

Foxwoods Casino and Mohegan Sun Casino in Connecticut, as well as debit charges related to vacations

for Irina and Movshovich.

| Date | Amount | Withdrawals / Debits |
|------|--------|----------------------|
| April  24, 2002 | $1,481.50 | ATM at Foxwoods |
| May 1, 2002 | $1481.50 | ATM at Foxwoods |
| May 2, 2002 | $1481.50 | ATM at Mohegan Sun |
| May 28, 2002 | $1481.50 | ATM at Foxwoods |
| May 28, 2002 | $1481.50 | ATM at Mohegan Sun |
| June 11, 2002 | $1481.50 | ATM at Foxwoods |
| June 21, 2002 | $1,888.70 | Celebrity Cruises |
| June 24, 2002 | $118.00 | B.J.'s Vacations |
| July 11, 2002 | $1481.50 | ATM at Mohegan Sun |
| July 11, 2002 | $1481.50 | ATM at Mohegan Sun |
| July 12, 2002 | $1481.50 | ATM at Mohegan Sun |
| July 18, 2002 | $1481.50 | ATM at Mohegan Sun |
| July 18, 2002 | $1001.75 | ATM at Mohegan Sun |
| July 18, 2002 | $1,481.50 | ATM at Mohegan Sun |
| July 19, 2002 | $1481.50 | ATM at Foxwoods |
| August 6, 2002 | $1481.50 | ATM at Foxwoods |
| September 9, 2002 | $1481.50 | ATM at Foxwoods |
| September 25, 2002 | $1481.50 | ATM at Mohegan Sun |
| September 25, 2002 | $1481.50 | ATM at Mohegan Sun |
| September 26, 2002 | $1481.50 | ATM at Foxwoods |
| October 24, 2002 | $1481.50 | ATM at Mohegan Sun |
| November 20, 2002 | $1481.50 | ATM at Foxwoods |
| December 5, 2002 | $1481.50 | ATM at Mohegan Sun |
| December 26, 2002 | $1481.50 | ATM at Foxwoods |

As Irina explained at trial, she and Movshovich withdrew cash from ATMs at the Connecticut casinos during their trips down to New York or New Jersey to purchase furniture.  The couples would withdraw the cash ostensibly to purchase furniture.  However, Irina admitted to using some of the cash withdrawn from the Company account to gamble.  The recurring amount of $1,481.50 represents the maximum amount of cash the ATM permitted to be withdrawn.  Irina described the couple's routine as follows:

> When we go to New York -- let me just explain this so you will understand. When we go to New York we usually leave after work around 8:00 o'clock [pm]. We go to casino. We slept overnight and at 3:00 o'clock in the morning we go to New York. So we usually withdraw the money and it was convenient for us to withdraw the money in Connecticut. And it's 3:00, 4:00 o'clock [a.m.], you leave to go to the New York and most of the money it was -- you telling me, it was taken from ATM to buy furniture. Because in order to sell the furniture we have to buy furniture and most of the company, Chinese company, most of the companies they don't accept company checks in New York.  They don't. They need cash and we have to bring them cash. That's all. So that's why we withdraw $1,500. Maybe I used couple of hundred. I don't remember. We gamble a little bit, you know. We had dinner. We slept overnight. We gamble a little bit and we at 3:00 o'clock, 4:00 o'clock in the morning we usually go to New York and be in New York around 7:00 o'clock in the morning.

The Company bank account statement also reveals that less than a month after Abramov had paid his initial $150,000 deposit, Irina and Movshovich used the Company bank account to pay for a vacation.  At trial, Irina admitted using the Company bank account for vacation purposes.

Q.      Were you using the company Europe Today bank account for vacation purposes also at this time?

A.      It was couple of times. It was a bonus for us, you know, to use the -- you know, was a bonus when we go on vacation. Yeah, it was a bonus.

Q.      Is that a yes, you were using it for vacation?

A.      It was a bonus from Europe Today to Irena and [Movshovich] to go on vacation for once in three or four years.

**G.  Abramov Obtains Documents from the Company Accountant, and Decides to Opt Out of the Deal**

11

In April 2003, Ted Ronkin, the Company accountant, came to the store to prepare the 2002 year-end taxes.  Abramov and Sofia were at the store and observed that Ronkin was reviewing the Company bank statements and creating a summary of the payments which the Company had made to the state of Massachusetts for sales tax over the course of the year 2002 ("2002 Sales Tax Summary").  Abramov and Sofia asked Ronkin if they could review the bank statements and the 2002 Sales Tax Summary.  Abramov made copies of these documents.  When Abramov reviewed the Company bank statements for January and February 2002, he discovered, for the first time, that Movshovich and Irina were using the Company account for personal expenses.  Additionally, he noticed a discrepancy between what Ronkin's summary indicated the Company *had actually paid* in sales tax and what he believed the Company *should have paid* in sales tax based on the Company's gross sales as reported to him by Movshovich and Irina in the 2002 Financial Summary.

The 2002 Sales Tax Summary, created by Ronkin, indicates that the company paid $14,388.04 in sales tax to Massachusetts for the year 2002.  In 2002, the Massachusetts state sales tax was five percent of gross receipts from sales of tangible personal property.  *See* MASS. GEN. LAWS ch. 64H, § 2 (1990), *amended by* MASS. GEN. LAWS ch. 64H, § 2 (2009).  Abramov was aware of this five percent sales tax rate, and he determined from reviewing the 2002 Sales Tax Summary that if the Company had only paid roughly $14,000 in sales tax, then gross sales would have only been roughly $280,000.  When he compared this figure with the 2002 Financial Summary presented to him by Movshovich and Irina, which indicated gross sales of over $1.1 million, Abramov concluded that the Company was probably underreporting gross sales and significantly underpaying sales tax.

Abramov subsequently confronted Movshovich about the documents he had obtained from Ronkin.  Abramov informed Movshovich that he and Sofia were opting out of the purchase of a stake in the Company because of his suspicion that the Company was not properly paying its sale tax or properly reporting its gross sales.  Abramov testified as follows:

12

So since I am not an expert, I don't know what happened, whether they had hidden this amount or under-reported it or under-paid.  I don't know what to call it, but the fact of the matter is that this $800,000 evaporated. I told Yefim about that and I told him that the IRS would find out about it for sure and I don't want any problems with IRS.  So Sofia and I decided not to go forward with the purchase of the company, and according to our agreement, I asked my money back, money that they owed me, so the deposit and the loans.

After unsuccessfully attempting to convince Abramov not to opt out of the deal, Movshovich agreed to pay back all of the money Abramov had paid toward the potential purchase.  The total amount at that time was $175,000.  However, Movshovich asked that Abramov wait to be repaid until he was able to secure a replacement buyer for the portion of the business Abramov no longer desired to purchase.  Movshovich also requested that Abramov continue working at the store until he could find a new buyer.  In exchange, Movshovich would pay Abramov a salary of $1,500 per month plus an extra $1,000 per month as payment for the time he worked at the Company in 2002 and received no share of Company profits.  Abramov agreed and he continued working in the store in 2003 while Movshovich looked for a new buyer.

### H.  The Florida Plan

In August or September of 2003, Movshovich informed Abramov that he was planning to move permanently to Miami, Florida with Irina and his son, Phillip Movshovich ("Phillip").  He told Abramov that he and Irina planned to sell their house and sell the entire Company.  They hoped to open a new furniture business in Florida.  Movshovich told Abramov that he would be able to pay back Abramov's money once he sold either his house or the Company.

Movshovich subsequently took several steps towards moving to Florida and starting a new business.  He put his Brookline, Massachusetts home on the market for sale.  He rented warehouse space in Florida and purchased three containers of furniture which he then sent to Florida.  Irina and Phillip went down to Miami to look for a condo to purchase.

13

In December 2003, Irina returned from Florida.  Movshovich and Irina approached Abramov and Sofia and asked to borrow $50,000 so that they could establish their new business and purchase a condo Irina had found in Miami.  Sofia said no.  Movshovich then approached Abramov alone, on a separate occasion, and pleaded for the $50,000.  Movshovich convinced Abramov that by helping to expedite the transition to Florida, Abramov would get all of his money back sooner.  Abramov testified as follows:

> [Movshovich] told me that this money will be extremely helpful to -- for him in order to establish new business in Miami, so he would sell his business and sell his house, so that's why it was so important to him.
> [. . .]
> I believe that if I give them money that would help them to establish business down there faster and they would sell business in Boston and they also would sell their house and thus, I will receive my money back. That would be easier.

On or about December 19, 2013, Abramov loaned Movshovich $50,000 by way of two separate checks in the amounts of $28,000 and $22,000.  At Movshovich's direction, Abramov made the $28,000 check payable to Phillip to use to purchase the Florida condo.  Abramov made the $22,000 check payable to Movshovich himself to establish the Florida business.  The total amount Movshovich owed to Abramov now totaled $225,000.

Movshovich again provides a dramatically different explanation as to this exchange of $50,000.  He asserts that this $50,000 did not represent a loan at all.  Rather, Movshovich asserts that Abramov and Sofia paid this $50,000 as part of their purchase price of a one-half interest in the Company.  Again, I do not find Movshovich's account to be credible.  Instead, I credit Abramov's account as set forth above.

Several months passed into 2004 and Abramov heard nothing of any progress the Movshovichs had made in Florida or of any progress Movshovich had made relative to selling their home and business in Massachusetts.  In March 2004, Sofia was diagnosed with cancer.  She passed away on December 5, 2004.  Abramov continue to work at the store for which he received a salary.  Movshovich's Florida plan never came to fruition.

I.   **2005 – 2006: Abramov continues to work at the Company store while waiting for Movshovich to repay the $225,000**

14

Throughout 2005 and 2006, while continuing to work at the Company store, Abramov repeatedly asked Movshovich for his money back.  Movshovich responded each time by telling Abramov that he was close to selling fifty percent of the business.  No new buyer ever materialized.  Abramov testified, "[Movshovich] was telling me that he had potential buyers for 50 percent of the company and the deal was very, very close, but every time the deal would not go through."

In 2005 and 2006, the Company's furniture selling business was down compared to previous years.  Movshovich reduced inventory, sold furniture from showrooms, and reduced the store rental space from two floors to one floor.  Abramov became increasingly concerned about getting paid back the $225,000.  He frequently pressured Movshovich to repay him what he was owed.  The two men increasingly argued as the tension between them escalated.

**J.    2007: Movshovich fires Abramov**

As of January 2007, Movshovich stopped paying Abramov as an employee altogether.  Abramov did not receive a salary for January, February, March, and April of 2007.  Abramov confronted Movshovich on various occasions about not getting paid either his salary or the $225,000 debt.  Movshovich repeatedly apologized and insisted that he would pay Abramov very soon.  The arguments between the two men increased significantly during these first months of 2007.

On May 8, 2007, Abramov was working in the store alone.  Movshovich called the store regarding some business issues.  During the phone call Abramov reminded Movshovich about his unpaid salary.  Movshovich told Abramov to write a check to himself using the company check book.  Abramov then wrote himself a check for $6,000 to cover his salary of $1,500 per month for the first four months of 2007.  On this same day, unbeknownst to Abramov, Movshovich opened a new business checking account for the Company.

On May 9, 2007, Movshovich and Irina arrived at the Company store on their day off.  They went into Irina's office, closed the door, and left about fifteen minutes later.  That same day, Movshovich put

15

a stop payment on Abramov's $6,000 check and closed the Company bank account from which the check was written.

On May 10, 2007, after arriving at the store, Movshovich began yelling at Abramov who was working with a customer. Movshovich accused Abramov of stealing from the Company. In the presence of customers, Movshovich yelled, "you are a dishonest person and you stole $6,000 from our company's account." The two men had an angry exchange of words after which Movshovich told Abramov, "You are fired. Don't come here anymore." Abramov threw his keys on his desk and left the store.

### K.  State Court Lawsuit and Judgment

Abramov never received repayment of any of the $225,000 he paid to Movshovich. Abramov never received any stock ownership in the Company. As a result of the foregoing, Abramov brought a civil suit for breach of contract[2] against Movshovich in Suffolk Superior Court. On March 8, 2012, by way of jury verdict, Abramov was awarded a judgment against Movshovich in the amount of $225,000 plus interest. Abramov subsequently obtained two executions against Movshovich in the amounts of $18,073.40 and $339,720.58 on March 8, 2012 and March 12, 2012, respectively.

## IV.  Jurisdiction

The matter before the court is a complaint under 11 U.S.C. § 523(a) to determine the dischargeability of a debt. The matter arises under the Bankruptcy Code and in a bankruptcy case and therefore falls within the jurisdiction given the district court in 28 U.S.C. § 1334(b) and, by standing order of reference, referred to the bankruptcy court pursuant to 28 U.S.C. § 157(a). It is a core proceeding. 28 U.S.C. § 157(b)(2)(I) (core proceedings include determinations as to the dischargeability of particular debts). This court accordingly has authority to enter final judgment in the matter. 28 U.S.C. § 157(b)(1).

---

[2] The parties have stipulated that Abramov voluntarily dismissed certain potential claims against Movshovich in the state court litigation for the purpose of effectuating a trial strategy.

V.      **Discussion**

    **A. Preliminary Matters**

The party seeking to except a debt from discharge bears the burden of proving each element by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991).  In furtherance of the Bankruptcy Code's 'fresh start' policy, exceptions to discharge are narrowly construed.  *Palmacci v. Umpierrez*, 121 F.3d 781, 786 (1st Cir. 1997).

    **B.   11 U.S.C. § 523(a)(2)(A)**

    **i.       Applicable Law**

Section 523(a)(2)(A) of the Bankruptcy Code excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A).  In order to establish that a debt is nondischargeable under § 523(a)(2)(A) due to a false representation, the plaintiff must prove each of the following elements by a preponderance of the evidence: "1) the debtor made a knowingly false representation or one made in reckless disregard of the truth; 2) the debtor intended to deceive; 3) the debtor intended to induce the creditor to rely upon the false statement; 4) the creditor actually relied upon the misrepresentation; 5) the creditor's reliance was justifiable; and 6) the reliance upon the false statement caused damage." *McCrory v. Spigel* (*In re Spigel*), 260 F.3d 27, 32 (1st Cir. 2001), citing *Palmacci*, 121 F.3d at 786).

The first element, making a knowingly false representation, refers to the conduct of the debtor and can include a debtor's promise to act, "[i]f, at the time he made his promise, the debtor did not *intend to perform*[.]" *Palmacci*, 121 F.3d at 786-87.  The second element, intent to deceive, refers to the Debtor's mental state and specifically requires a mental state embracing an intent to deceive, manipulate, or defraud. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 1380–81, 47 L.Ed.2d 668 (1976); *Palmacci*, 121 F.3d at 786-87.  "Availability of direct evidence to prove a debtor's

intent to deceive a creditor is unlikely to be obtained.  The court may infer fraudulent intent from the totality of circumstances.*" Danvers Savings Bank*, 427 B.R. at 195, citing *Palmacci*, 121 F.3d at 789. Among the circumstances from which scienter may be inferred are: the defendant's insolvency or some other reason to know that he cannot pay, his repudiation of the promise soon after made, or his failure even to attempt any performance. *Palmacci*, 121 F.3d at 789.  Although the inquiries are distinct, in many cases the same factors show both the debtor's knowledge or recklessness as to the falsity of his representation and his intent to deceive. *Faria v. Silva (In re Silva)*, 2014 WL 217889 at *5 (Bankr. D. Mass. Jan. 21, 2014), citing *Bellas Pavers, LLC v. Stewart (In re Stewart),* MB 12–017, 2012 WL 5189048 at *8 n. 4 (B.A.P. 1st Cir. Oct. 18, 2012)

The final four elements embody the requirement that the creditor's claim must arise directly from the debtor's fraud.  *Faria*, 2014 WL 217889 at *5, citing *McCrory*, 260 F.3d at 32.  As to the creditor's reliance, the Supreme Court of the United States has held that § 523(a)(2)(A) requires only justifiable reliance—a lower standard than reasonableness.  *Field v. Mans,* 516 U.S. 59, 70 (1995). Reliance is justifiable if the falsity of the representation would not have been readily apparent to the person to whom it was made.  *Id.* at 70-72.   Under the justifiable reliance standard, "a person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'" *Id.*, quoting Restatement (Second) of Torts § 540.  For purposes of determining whether reliance was justified, "the circumstances of the reliance claim must be taken into account," and "the individual is not obliged to investigate statements made to him (although he cannot shut his eyes to an obvious falsehood)." *Lentz v. Spadoni* (*In re Spadoni*), 316 F.3d 56, 59 (1st Cir.2003).

The language of § 523(a)(2)(A) expressly excludes any statement "respecting the debtor's or an insider's financial condition."  Within § 523(a)(2), the special case of statements respecting the debtor's or an insider's financial condition is governed by subsection (a)(2)(B), which subjects such statements to

different requirements for exception from discharge. *See* 11 U.S.C. § 523(a)(2)(B)(ii) (excepting from discharge certain "statements respecting the debtor's or an insider's financial condition"). Subsections (a)(2)(A) and (a)(2)(B) are therefore mutually exclusive. *In re Cajigas*, 514 B.R. 61, 66 (1st Cir. BAP 2014) (*citations omitted*). The Bankruptcy Code does not define "statement respecting financial condition," and there is disagreement among courts about the breadth of this term. *See id.* at 67; *In re Kosinski*, 424 B.R. 599, 609–610 (BAP 1st Cir.2010) (*collecting cases*). However, the courts generally agree that the term encompasses a statement regarding an entity's overall net worth, income flow, or ability to generate income. *See Follo v. Morency  (In re Morency)*, 2013 WL 1342485 at *6 (Bankr. D. Mass. Apr. 2, 2013), *aff'd in part and remanded Follo v. Morency*, 507 B.R. 421 (D. Mass. 2014)(*collecting cases*).

ii.       **Analysis**

Abramov asserts five false representations on the part of Movshovich: 1) Movshovich misrepresented the value of the Company; 2) Movshovich misrepresented that he would disclose all company financial documents; 3) Movshovich misrepresented the use of proceeds generated from the plaintiff's payments in the amount of $175,000 and misrepresented that he was willing to sell a one-half interest in the Company to the plaintiff; 4) Movshovich misrepresented how he intended to utilize company profits; 5) Movshovich misrepresented that the $50,000 loan would be repaid.

The first alleged misrepresentation – that Movshovich misrepresented the value of the Company – refers to Movshovich's verbal statement to Abramov during the initial negotiations that the Company's value exceeded $1 million. This alleged misrepresentation fails to satisfy the requirements of § 523(a)(2)(A) for two reasons. First, Movshovich's statement regarding the value of the Company is not properly within the scope of § 523(a)(2)(A) because it qualifies as a statement respecting an insider's financial condition. Section 523(a)(2)(A) explicitly excludes such statements. The term "insider" as defined in section 101 of the Bankruptcy Code includes a "corporation of which the debtor is a director, officer, or person in control" if the debtor is an individual. 11 U.S.C. § 101(31). The Company is a

Massachusetts corporation of which Movshovich was an officer at the time of the representation.

Accordingly, the Company qualifies as an "insider."  Moreover, Movshovich's statement addressing

specifically and solely the overall value of the Company falls squarely within even the narrowest

interpretations of what constitutes a "statement respecting financial condition."  Second, even if the

alleged misrepresentation were properly considered under § 523(a)(2)(A),  Abramov testified that he did

not rely on this representation as an accurate assessment of the Company's value.  Abramov stated in

his testimony, "I told [Movshovich] that the store -- the value of the store was overrated and I suggested

instead of 1.5 million dollars, $500,000."  For these reasons, this alleged misrepresentation does not

meet the requirements of § 523(a)(2)(a).[3]

The other four alleged false representations are all properly within the scope of § 523(a)(2)(a).

Abramov asserts that Movshovich made certain promises without the intent to honor them in order to

induce Abramov to extend first the $150,000 deposit, then additional funds totaling $25,000, and finally

a $50,000 loan to help the Movshovichs' move to Florida.  Movshovich, on the other hand, asserts that

there were no false representations.  To the extent that he did not ultimately fulfill any of his

obligations, Movshovich asserts that Abramov has not proven a lack of intent to honor these obligations

at the time the representations were made.

On the basis of the findings of fact set forth above, I find by a preponderance of the evidence

that Movshovich made the following representations to Abramov: During initial negotiations,

Movshovich promised that he would disclose to Abramov all Company financial documents.  During

these same negotiations, Movshovich promised that Abramov's initial $150,000 deposit would be

attributed to Abramov's purchase of a one-half interest in the Company or, alternatively, that it would

be refunded in the event the deal was not consummated.  Additionally, Movshovich promised, in the

course of these initial negotiations, that if the deal were ultimately consummated, Abramov would

---

[3] Nor does this statement meet the requirements of § 523(a)(2)(B) as it is not a statement in writing.

receive fifty percent of Company profits for the period from June 2002 through December 2002. Later,

Movshovich promised that loans made by Abramov to Movshovich and Irina totaling $25,000 would

either be attributed to Abramov's purchase of a one-half interest in the Company or, alternatively, that

it would be refunded in the event the deal was not consummated. Finally, in December 2003,

Movshovich promised to repay Abramov the additional $50,000 he borrowed in order to establish his

new business in Florida.

Further, I find that Movshovich made these promises without intent to honor them and that

Movshovich made these false representations with the subjective intent to deceive Abramov. As noted

above, the finder of fact may infer intent to deceive from the totality of the circumstances. An

examination of the totality of Movshovich's dealings with Abramov demonstrates not just Movshovich's

lack of any honest attempt at performing his promises, but also a pattern of deliberate omissions and

misinformation. From this overall pattern of conduct, as set out in the findings above and as

emphasized below, I infer that Movshovich never intended to honor the above representations at the

time he made them.

In February 2002, while Abramov was trying to assess the value of the Company, Movshovich

provided Abramov with financial information about the Company, in the form of the 2001 Financial

Summary, that was grossly inconsistent with information the Company would later disclose to the I.R.S.

in its tax filings. Prior to the June 5, 2002 closing, and continuing well afterward, Movshovich and his

wife used the Company bank account for personal expenses, including home mortgage payments,

gambling, and vacations. Also prior to the June 5, 2002 closing, and continuing well afterward,

Movshovich took significant amounts of Company cash home in his pockets, kept this cash in his house,

and intermingled it with his personal funds. During negotiations in which Movshovich knew that

Abramov was attempting to evaluate the Company's value and performance, Movshovich did not

disclose his habits of taking Company cash home and using the Company bank account for personal

expenses either verbally or in the handwritten financial summaries.  Instead, Movshovich offered to split

the profits of the Company on a fifty-fifty basis without ever disclosing that a significant portion of

Company proceeds were going directly into Movshovich's pockets, both figuratively and literally.  Nor

did Movshovich attempt to curb this behavior once Abramov paid a $150,000 deposit and began

working at the store as a potential business partner.  In fact, the Company bank account statement

reveals that just weeks after Abramov began working at the store, Movshovich and Irina used the

Company account to pay for a vacation.  The Company bank account statements from the subsequent

months reveal frequent maximum withdrawals at casino ATMs.  These withdrawals were made over the

period when Movshovich and Irina solicited an additional $25,000 from Abramov which they promised

would be attributed to the purchase price of a fifty percent interest in the company.  Additionally,

during this time period, Movshovich continued his practice of bringing home Company cash.

        In February 2003, while Abramov was still attempting to vet the Company's financials,

Movshovich and Irina provided Abramov with the 2002 Financial Summary, which, like the 2001

Financial Summary, was grossly inconsistent with the information the Company later disclosed in its tax

filings.  Additionally, this document, like the earlier handwritten financial summaries, provided no

indication that Movshovich was taking home cash proceeds or that Movshovich and Irina were spending

Company money on personal expenses.

        When Abramov ultimately obtained additional documentation from the Company accountant

and decided to opt out of purchasing a fifty percent interest, Movshovich stalled in paying back the

$175,000 insisting that he needed time to find an alternate buyer.  In December 2003, Movshovich

solicited Abramov for an additional $50,000 loan, insisting that it would enable him to start a new

business in Florida and pay back Abramov all of the money he was owed.  Abramov loaned the $50,000,

and as the months passed, the Florida plan never came to fruition.  Eventually, years past and

Movshovich made no attempt whatsoever to pay Abramov back what he was owed.

In May 2007, as tensions came to a head after Movshovich had stopped paying Abramov even his salary as an employee, Movshovich fired Abramov, further belying Movshovich's claim that he viewed Abramov as a fifty percent owner of the Company.  Abramov asserts that Movshovich "set him up" to be fired by telling Abramov to write himself a check for his salary and then accusing him of stealing from the Company account.  I need not and do not reach this issue.  There is already enough evidence of Movshovich's course of conduct from which the Court may infer that Movshovich never intended to honor the representations he made to Abramov.  Movshovich made no attempt to disclose all of the company's financial documents as agreed, instead providing handwritten summaries that, as discussed above, either omitted critical information or were grossly inconsistent with Company tax filings.  Movshovich never attempted to attribute Abramov's payments to an ownership interest or, alternatively, to refund the money as agreed when Abramov opted out of the deal.  Movshovich made no attempt to split Company profits as agreed.  Rather, he and Irina used Company proceeds for personal expenses without regard for Abramov's potential interest.  Finally, Movshovich never attempted to repay Abramov the $50,000 loan, even after he decided not to move to Florida.  Instead, he stalled for years and eventually fired Abramov from employment at the Company.  I infer from a review of the totality of the circumstances that Movshovich made the above representations with subjective intent to deceive Abramov.

With regard to the remaining elements, I find that Movshovich intended to induce Abramov to rely on his misrepresentations, that Movshovich actually relied on them, and that Abramov suffered damages as a result of this reliance.  The bulk of Movshovich's misrepresentations were made in the course of negotiating the terms of selling an interest in his business to Abramov.  Additional misrepresentations were made while Movshovich was attempting to solicit loans from Abramov.  I infer from these circumstances that Movshovich made these misrepresentations with the intent of inducing Abramov to rely on them as he parted with his money.  I credit Abramov's testimony in that he actually

relied on these misrepresentations when he gave his money to Movshovich. I also credit Abramov's testimony that he parted with a total of $225,000.

The only remaining question is whether Abramov's reliance was justifiable. With regard to the initial $150,000, Abramov was relying on Movshovich's representations that he would eventually disclose all Company financial documents, that the deposit would be attributed to Abramov's purchase of a one-half interest in the company or alternatively refunded, and that Movshovich would divide the Company profits. Abramov only paid the initial deposit after months of negotiations, after reviewing certain documents which Movshovich had presented to him, and after securing Movshovich's agreement that the money would be refunded if either party decided to back out of the deal. Additionally, there existed a basis for trust between the parties as the above representations were made to Abramov by a friend of his wife, Sofia. Accordingly, I find that the falsity of Movshovich's representations was not readily apparent and that Abramov's reliance on Movshovich's representations in extending the initial $150,000 was justifiable.

Abramov relied on all the same above representations in paying an additional $25,000. Moreover, he received further assurance from Movshovich and Irina after writing the first of four checks that these funds would also be attributed to the purchase price of a one-half interest in the Company or, alternatively, refunded to him. Accordingly, I find that that Abramov's reliance on Movshovich's representations in extending an additional $25,000 was also justifiable.

The closest call on the issue of justification is in regard to the final $50,000 loan made in December 2003. At that point, Abramov had already conveyed $175,000 to Movshovich and Irina. He had already decided to opt out of the deal to purchase an interest in the Company because he believed Movshovich and Irina were not paying the appropriate amount of sales tax. Moreover, by this point, he had learned that Movshovich and Irina had been using the Company account for personal expenses. In

24

other words, Abramov had reason to be suspicious of Movshovich's assurance that he would pay back

the $50,000 loan.

With regard to the $50,000 loan, Abramov asserts what is essentially an "in for a dime, in for a

dollar" argument.  By helping finance Movshovich's move to Florida, Abramov would be helping to

speed along the sale of the Company and the sale of Movshovich's Brookline home.  Once Movshovich

had the funds from the sale of the Company or his house, he could pay back Abramov.  Again, Abramov

testified as follows:

> I believe that if I give them money that would help them to establish business down
> there faster and they would sell business in Boston and they also would sell their house
> and thus, I will receive my money back.

Abramov had evidence of the sincerity of Movshovich's scheme.  Movshovich had placed his

house on the market, had rented warehouse space in Florida, and had sent three recently-purchased

containers of furniture to Florida.  Additionally, Irina and Movshovich's son, Phillip, had spent months

down in Miami looking for a condo.  Given these circumstances, I find that the falsity of Movshovich's

representation was not readily apparent and that Abramov's reliance was justifiable.

I conclude that Abramov has established cause to except these amounts, totaling $225,000, plus

accrued and accruing interest, from discharge under § 523(a)(2)(A).

**C.   11 U.S.C. § 523(a)(2)(B)**

Section 523(a)(2)(B) of the Bankruptcy Code excepts from discharge any debt "for money,

property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by use of a

false statement in writing that is (i) materially false; (ii) respecting the debtor's or an insider's financial

condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or

credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to

deceive[.]"  11 U.S.C. § 523(a)(2)(B).  As materially false statements in writing, Abramov points to the

three handwritten financial summary sheets presented by Movshovich and Irina to Abramov.  For

reasons detailed below, I find that only the 2001 Financial Summary satisfies all the elements of §

523(a)(2)(B).

   a.   **Materially False**

   To except a debt from discharge under § 523(a)(2)(B), the creditor must prove that, when the

financial statement was made, it was not only false but "materially" so.  A statement is materially false if

it

> paints a substantially untruthful picture of financial conditions by misrepresenting
> information of the type that would normally affect the decision to grant credit. The
> question of materiality should be judged not on the basis of size or seriousness of the
> error but by a comparison of the debtor's actual financial condition with the picture he
> paints of it. A financial statement which markedly overstates the value of a person's
> assets, so as to distort his financial picture must be considered materially false.

*Merchants Nat'l Bank v. Denenberg* (*In re Denenberg*), 37 B.R. 267, 271 (Bankr.D.Mass.1983) (*internal

citations omitted*).

   As discussed above, during their meeting in February 2002, Movshovich and Irina presented

financial summary sheets to Abramov and Sophia as evidence of the Company's value.  The 2001

Financial Summary showed gross sales of $1,177,600 and net profit of $226,420 for the year 2001.

Meanwhile, the Company's federal income tax return for the year 2001 ("2001 Company Tax Return"), a

document that Abramov was only able to obtain years later by way of discovery in state court litigation,

reported gross sales of $516,862 and a net operating loss.  Moreover, while these documents purported

to show gross sales and net profit, there was no indication of the Movshovichs' private funneling of a

significant portion of these funds, a practice which continued well after Abramov began working at the

store as a potential business partner.  The Court concludes that the 2001 Financial Summary Sheet

contained misrepresentations of the Company's gross sales and net profit that were material.[4]

   b.   **Respecting the debtor's or an insider's financial condition**

---

[4] No evidence was presented as the material falsity of the 2000 Financial Summary Sheet.  Accordingly, that
document does not satisfy the elements of § 523(a)(2)(B).

The term "insider" as defined in section 101 of the Bankruptcy Code includes a "corporation of which the debtor is a director, officer, or person in control" if the debtor is an individual. 11 U.S.C. § 101(31).  The Company is a Massachusetts corporation of which Movshovich was an officer at the time of the written representations.  Accordingly, the Company qualifies as an "insider."

As noted above, the Bankruptcy Code does not define "statement respecting financial condition," and there is disagreement among courts about the breadth of this term. *See In re Kosinski*, 424 B.R. 599, 609–610 (BAP 1st Cir.2010) (collecting cases). However, the courts generally agree that the term encompasses a statement regarding an entity's overall net worth, income flow, or ability to generate income. *See Follo*, 2013 WL 1342485 at *6.

The 2001 Financial Summary, displaying the Company's gross sales and net profit for the year 2001, fits within these parameters.

### c.   On which the creditor to whom the debtor is liable reasonably relied

Unlike section 523(a)(2)(A), section 523(a)(2)(B) explicitly requires the creditor's reliance to be reasonable. The reasonableness of reliance is to be objectively determined in view of the totality of the circumstances. *In re Figge*, 94 B.R. 654, 665 (Bankr. C.D. Cal. 1988); *see also Collier on Bankruptcy*, at ¶ 523.08[2][d].

First, I address the issue of actual reliance.  I credit Abramov's testimony that he relied on the 2001 Financial Summary as an accurate assessment of the Company's finances when he was negotiating. I find that Abramov relied on the 2001 Financial Summary when he paid the initial $150,000 deposit and when he wrote four additional checks totaling $25,000.  I do not, however, find that he relied on the 2001 Financial Summary when he made the $50,000 Florida loan as he had already discovered the document's material falsity by that point.[5]

---

[5] With regard to the 2002 Financial Summary, I find that Abramov did not rely on this document in making the initial $150,000 as he had not received the document yet.  Moreover, the evidence shows that Abramov paid at least the first three checks that made up the additional $25,000 prior to receiving the 2002 Financial Summary.

As to reasonableness, the 2001 Financial Summary was created in front of Abramov from what Movshovich and Irina purported were actual customer sales slips and the Company corporate journal. Additionally, Abramov received the 2001 Financial Summary over the course of negotiations that lasted several months and from friends of his wife, Sofia.  Given the length of the negotiations, Abramov's witnessing of the creation of the 2001 Financial Summary from original Company documents, and the trusting nature of the relationship between Sofia and the Movshovichs, I find that Abramov's reliance on the information in the 2001 Financial Summary was reasonable.

### d.  The debtor caused the statement to be made or published with intent to deceive

As discussed above in the findings of fact, Movshovich and Irina guided Sofia in creating the 2001 Financial Summary sheets from documents which they purported to be actual customer sales slips and the Company corporate journal.

Movshovich asserts that Abramov has not met his burden establishing an intent to deceive.  As with the above analysis under § 523(a)(2)(A), intent to deceive under § 523(a)(2)(B) may be proven by direct or circumstantial evidence.  *See In re O'Donnell*, 728 F.3d 41, 47 (1st Cir. 2013); *Keegan v. Swan* (*In re Swan*), 499 B.R. 118, 126 (Bankr. D. Mass. 2013).  Because direct evidence of intent is rarely available, intent to deceive may be inferred from the totality of the circumstances surrounding the debtor's act, including the debtor's reckless indifference to, or reckless disregard of, the accuracy of the financial information submitted to the creditor.  *In re O'Donnell*, 728 F.3d at 47.  "A debtor's mere unsupported assertions of honest intent will not overcome natural inferences derived from admitted facts."  *Keegan v. Swan*, 499 B.R. at 126, quoting *Agribank v. Webb* (*In re Webb*), 256 B.R. 292, 297 (Bankr. E.D. Ark. 2000).

---

Abramov received the 2002 Financial Summary in February 2003, which is the same month he wrote the fourth and final check making up the $25,000.  However, no evidence was presented as to what day in February he received the Summary or whether he received it before or after he paid the fourth and final check.  As the burden lies with Abramov on this point, I find that Abramov did not rely on the 2002 Financial Summary in writing any of the four checks totaling $25,000.  Finally, I find that he did not rely on the 2002 Financial Summary in making the $50,000 Florida loan because he had already discovered the material falsity of the document by that time.

As discussed above, I find that Movshovich's entire course of conduct with Abramov demonstrates a pattern of deliberate misinformation.  The evidence not only shows material falsity in the 2001 Financial Summary, but it shows that Movshovich repeated his use of materially false documents when, several months later, he presented to Abramov the 2002 Financial Summary that contained the same latent problems as the earlier document.   Moreover, Movshovich never disclosed to Abramov his habit of taking Company cash home or the fact that he and Irina were using the Company account for personal expenses including gambling, vacations, and home mortgage payments.  Accordingly, I find that Movshovich intended to deceive Abramov when he presented him with the 2001 Financial Summary as evidence of the Company's value.

I conclude that Abramov has established cause to except these amounts, totaling $175,000, plus accrued and accruing interest, from discharge under § 523(a)(2)(B).  Abramov has not, however, established cause to except the $50,000 Florida loan from discharge under § 523(a)(2)(B).

### D.   11 U.S.C. § 523(a)(4)

### i.        Applicable Law

Section 523(a)(4) of the Bankruptcy Code excepts from discharge any debt "for fraud or defalcation while acting in a fiduciary capacity." 11 U.S.C. § 523(a)(4).  To except a debt from discharge under § 523(a)(4), a creditor must establish that the debtor acted as the fiduciary in a fiduciary relationship and that his or her conduct in that capacity constituted a defalcation.  *In re McQuillin*, 509 B.R. 773, 787-88 (Bankr. D. Mass. 2014).

Federal law determines whether a fiduciary relationship exists under § 523(a)(4). *Raso v. Fahey* (*In re Fahey*), 482 B.R. 678, 688 (1st Cir. BAP 2012); *In re McBride*, 512 B.R. 103, 113 (Bankr. D. Mass. 2014).  The "broad definition of fiduciary under nonbankruptcy law—a relationship involving trust, confidence, and good faith—is inapplicable in the nondischargeability context." *Fahey*, 482 B.R. at 688, quoting *Honkanen v. Hopper* (*In re Honkanen*), 446 B.R. 373, 378–79 (9th Cir. BAP 2011)). Under federal

law, a fiduciary relationship arises by virtue of an express or technical trust. *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 333, 55 S.Ct. 151, 79 L.Ed. 393 (1934); *Rutanen v. Baylis* (*In re Baylis* ), 313 F.3d 9, 17 n. 3 (1st Cir.2002). "The elements of an express trust have traditionally included an explicit declaration of trust, a clearly defined trust res, and an intent to create a trust relationship." *Fahey,* 482 B.R. at 687. "A technical trust is one that arises under statute or common law." *Petrucelli v. D'Abrosca* (*In re D'Abrosca*), 2011 WL 4592338, at *5 (1st Cir. BAP Aug. 10, 2011); *M–R Sullivan Mfg. Co., Inc.* (*In re Sullivan* ), 217 B.R. 670, 675 (Bankr.D.Mass.1998).

Additionally, in the context of closely held corporations, some courts within this circuit have suggested that a fiduciary relationship for purposes of § 523(a)(4) "could be established by the existence of a contract and substantial ascendancy of one shareholder over another as an alternative to an express or technical trust." *E.g.*, *Petrucelli v. D'Abrosca* (*In re D'Abrosca* ), 2011 WL 4592338, at *5 (1st Cir. BAP Aug. 10, 2011); *Farley v. Romano* (*in re Romano*)*,* 353 B.R. 738, 762–63 (Bankr.D.Mass.2006); *D'Anello v. D'Anello* (*In re D'Anello*), 477 B.R. 13, 26 (Bankr. D. Mass. 2012).

**ii.    Analysis**

Abramov asserts that Movshovich, "as a successful business owner and manager, held a position of trust and prominence over Abramov," who at the time was a recent immigrant unable to speak English.  Abramov further asserts that Movshovich acted as a mentor in the process of purchasing a business in the United States.  Abramov concludes that through the parties' "business relationship and Movshovich's elevated stature in said relationship, Movshovich acted in a fiduciary capacity."  Even if I were to accept this characterization of the Movshovich/Abramov relationship as one of a business mentor and a trusting recently-immigrated mentee, Abramov cites no law supporting the classification of such a relationship as one of fiduciary duty.  Nor has this Court been able to find any case law supporting such a theory of establishing a fiduciary relationship.  Accordingly,  I decline to find the existence of fiduciary capacity under such a basis.

Alternatively, Abramov cites to Judge Feeney's opinion in *Farley v. Ramano*, discussed above, for the premise that in the context of closely held corporations, a fiduciary relationship "could be established by the existence of a contract and a substantial ascendancy of one shareholder over another as alternative to an express trust." *Farley v. Romano (In re Romano),* 353 B.R. 738, 762–63. This theory of establishing fiduciary capacity is inapplicable to the facts of this case. No ownership interest in the Company was ever transferred to Abramov. Instead, the parties explicitly agreed that Abramov could opt out of his potential purchase after a period of due diligence. Abramov did, in fact, choose to opt out of the deal prior to ever becoming a shareholder. Accordingly, I find the *Farley v. Ramano* analysis does not apply to this case and that Abramov has failed to establish the existence of a fiduciary capacity.

Abramov having failed to establish that Movshovich was acting in a fiduciary capacity, I conclude that Abramov has failed to establish cause to except any of the above amounts from discharge under § 523(a)(4).

### VI. Conclusion

For the reasons set forth above, the Court will enter a separate judgment declaring that the state court judgment is excepted from discharge in its entirety, including all accrued and accruing interest thereon. The entire state court judgment is excepted from discharge under § 523(a)(2)(A), and, as a separate basis, all but $50,000 of the state court judgment is excepted from discharge under § 523(a)(2)(B).

Date: October 23, 2014

_____
Frank J. Bailey
United States Bankruptcy Judge